The question is: Is one of three claimants the son of Florence Georger, born in Washington, D.C., February 11th, 1896, and abandoned three days later? That son is entitled to $325,000 under the will of his grandfather.
William E. Emery bequeathed $650,000 in trust to pay the income for life to his two daughters, May and Florence; upon death of either, income to issue, in default of issue, income to the survivor; upon the death of both daughters, one-half the principal to the issue of each, and if either has no issue surviving that event, the whole to the issue of the other. May died leaving a son, Vivian E. Cornelius. He is entitled to the fund if the claimants fail.
Florence married Francis Frederick (Fritz) Georger at her parents' home in Flemington, September 25th, 1895. They had been secretly married in Brooklyn two months before, July 15th, under the names of Fred. Fr. Gray and Florence Baker. They lived in New York City. Florence divorced Georger in 1910 and married one Billings. Georger is dead. Florence died in 1928. Two years before, she told Mr. George B. Case, the trustee of the fund, that early in February, 1896, her husband, fearing that her father would disinherit her upon learning of the birth, took her to Washington, D.C., where they registered at the Shoreham as Mr. and Mrs. Francis S. Gray, and where they stayed; that about February 10th she was removed to the Physicians Hospital, a private hospital, within walking distance of the hotel, where she gave birth to a son on February 11th, 1896; that she was attended by Dr. Walsh; that three days later the child was taken away by a woman named Sophie Landgraf, who, her husband said, was procured for him by a Grace Wolf, a tenant of a house in charge of Georger's real estate firm and who, he said, had told him she would have nothing to do with the child unless it was a final parting, an abandonment; that she knew of someone who would be willing to adopt the child; that they were wealthy, but that they would not wish to have any further information as to the parents; that two years later her husband told her he *Page 603 
had seen Sophie Landgraf, who reported the boy to be much better off than the parents would ever be and that since then she had heard nothing more of him. Florence had previously told of the birth of the child to her father, her sister May, and to a number of her intimates. The Bankers Trust Company, substituted trustee, set afoot a nation-wide search and followed up every possible clue and sought every available record so exhaustively that it may be said with assurance that if one of the claimants is not the child, further effort to find it will be futile.
Our inquiry is confined to a male child born February 11th,1896. That was Florence's hallmark, and, invented or true, if it be lacking in a claimant, it is fatal to his cause. It is possible that the story was an invention, but all the indications are that she was delivered of a child on February 11th, 1896, in Washington. There is this mute evidence of the birthday: In Florence's diary for 1897, under date of February 11th she wrote, "one year." In her diary for 1899 under the date of February 11th appears "three years," and between and many times on the 11th of the month she noted the flight of time from February 11th, 1896. From Mr. Brooke, Georger's partner, we have proof that the Georgers were in Washington from early in February to the first part of March, 1896, and he is able to fix the time with certainty, because their delayed return threatened to interfere with his own wedding, February 26th, 1896. Georger also told Brooke, before going away, that his wife was pregnant, but he says her condition was not apparent, that she laced tightly; and that after they returned Georger told him she had stumbled and suffered a miscarriage. There is silent testimony that they were away from home. Florence was a theatre goer and kept a record of dates and the shows she attended, and they correspond with New York newspaper advertisements of the shows. There are no entries after February 1st until March 21st, 1896. The New York Times, under date of February 7th, 1896, published as among hotel arrivals at the Shoreham from New York, "Mr. and Mrs. Francis S. Graye." (Francis *Page 604 
was Georger's first name and they were secretly married under the name of Gray.) The Shoreham Hotel was torn down and the register is lost.
In the latter part of January or early in February, 1896, a child was born at the Providence Hospital, Washington, located at Second and D streets, N.E., and two miles away from the Shoreham. The child was taken away two or three days later. The hospital took no maternity patients, but this was an emergency case. The hospital had been notified by telephone it was coming from the station of the Baltimore and Ohio railroad, nearby, on which the patient was traveling, as she later told Sister Mary Alice, either from New York going south or from the south going to New York, the sister did not recall, and she gave the story that she had expected to reach her destination before being overtaken and that she wanted to be away from home when the baby was born; that she did not want her people to know that she was giving birth to a child. The patient was brought in on a stretcher accompanied by a man; she was in an advanced stage of labor and an interne speedily delivered the child. The impression at the hospital was that the child was illegitimate. Sister Mary Alice, then a young nurse at the hospital, and this was her first maternity case, identified Florence's photograph as that of her patient, whom she described as blonde, refined and cultured, but very sad, and in her early thirties, not over thirty-two. Another student nurse, now Mrs. Haspel, who sometimes assisted Sister Mary Alice, also identified the patient from the photograph as did a third nurse, both of whom said she was a young girl of twenty or twenty-two. The third nurse, now Mrs. Basford, also ventured that a photograph of Georger was that of the man who visited the patient, whom she describes as much older than the girl and that he looked like a "bold, bad man." Sister Mary Alice has no recollection of a man visiting her patient and Mrs. Haspel could not recognize Georger's photograph as the caller she saw. The records of the hospital do not show this birth, nor do the records of the bureau of vital statistics of Washington, though a careful *Page 605 
search was made. A Dr. Walsh was not connected with the hospital.
About the same time another tragedy was taking place at Dr. Taber Johnson's Private Hospital at Seventeenth and K streets, N.W., a twenty-bed private institution for the diseases of women. A baby boy was born there and taken away two or three days later by the supposed father and a woman. The case was kept secret by order of Dr. Johnson, who informed the head nurse that the case was coming from the Shoreham; that the people were coming under an assumed name and that the baby was to be taken away as soon as convenient. No record is to be found of this birth. Dr. Johnson, not Dr. Walsh, delivered the child. Dr. Walsh was the house physician at the Shoreham, with offices across the street, and Dr. Johnson was the leading obstetrician whose hospital was four blocks away. There were other private hospitals in the neighborhood, but there was no Physicians' Hospital in Washington.
Dr. Johnson's hospital and the circumstances surrounding the birth of the child at that institution more nearly favor Florence's recital of her experience than do those attending the birth at the Providence Hospital. The Georgers had gone to Washington to prepare for the event, and in time to arrange for the accouchement. Theirs was not an emergency case from a railroad station, and it is highly improbable that Georger would have sent his wife to a distant hospital, where maternity cases were not taken, to have his wife delivered by an interne, though be it, that the three nurses identified Florence from her photograph, and this after thirty-four years of absence, and meanwhile, no doubt, having attended scores of blonde, refined, cultured and sad young mothers, all in distress, some resigned to the torture, others torn by their misfortune. The good faith of the nun and the nurses is not questioned. The unusual incident in their early training no doubt made a profound impression, and recent notoriety of the case has revived memories, but that the photographic identification is more than an honest fancy may well be doubted when it is considered that the occurrences *Page 606 
they relate are irreconcilable with Florence's version of the events leading to the birth of her child.
It is not proved that the child brought into the world at the Providence Hospital or the one born at Dr. Johnson's hospital was the Georger child; as to the former, the improbabilities are outstanding, as to the latter, the probabilities are purely speculative.
The three contenders, Leo Sova, of Milwaukee; Albert Childers, of Los Angeles, and James Edward Nicholson, of Baltimore, each claims to be the Georger child, born in Washington and taken away by Sophie Landgraf. To succeed against Cornelius, the acknowledged next of kin of the missing child, the proof must be positive and convincing.
Leo Sova is short, heavy set and blonde. Witnesses testified that he resembles Florence, but this is his history: He first found himself in 1902 at Wilson, Michigan, living with a family of the name Sova. He traces himself back to the New York Foundling Asylum. The records of the asylum show that he was received there November 25th, 1890, under the name of Cyril Maitland; that he was then seven weeks old, and that he was adopted July 8th, 1897, by William Badgeur, of DeLonghary, Michigan. He does not recall the Badgeurs. His theory is that Sophie Landgraf put him in the asylum. He rests upon the records of the institution to identify himself and they establish that he was five years old when the Georger child arrived and read him out of the case.
Albert Childers is tall, spare and swarthy, and he reflects the humble circumstances of his foster parents and their low order of intelligence. They tell the story that Sophie Landgraf brought the child to them on or about February 15th, 1896, and that it came about in this manner: They were downtown in Washington shopping when, accidentally, they met Sophie, whom Mrs. Childers knew back in Boston, in 1885, when they were chambermaids in the Marion Hotel. Later Sophie called upon them, found them childless and offered to get them a child; they expressed a preference for a girl, but a few days later Sophie brought a boy baby. *Page 607 
Sophie came with a man whom she introduced as Mr. Gray, the father, who disappeared while Sophie and Mrs. Childers were upstairs putting the child away; and so did Sophie after a few more calls. Mrs. Childers had a photograph of Sophie, given to her before Sophie left in 1885, and she and her husband and one Walter, a friend, verify the likeness, and Walter also testifies to the presence of the baby and of talking with Sophie about it — the Sophie of the photograph. Childers also identified the photograph of Georger as the man Gray who came with Sophie and the child, and he adds this bit of romance: While casually in New York, in May, 1896, with "Boney" Clark (they were fellow railroaders on a day's trip), Boney addressed a man on Twenty-third street, "Hello, Georger;" that he afterwards asked Boney if his real name was Georger, and being told that it was, said to Boney that he looked like a man he knew in Washington as Gray, and Boney replied that he, too, had seen him in Washington that winter. The whole attenuated story is nicely woven together and was well told, but it is hardly likely that Georger, who was bent on losing his child, would have exposed himself by going along with Sophie, and it is improbable that in midwinter, with fire in the kitchen stove downstairs, a newly-born baby would be taken to a cold upstairs room. And it is also strange that Mrs. Childers was not curious enough to ask Sophie where the baby came from or anything about it, or to inquire about her occupation, or her whereabouts and doings since they separated years before. Mrs. Childers' photograph of Sophie is, according to their witness, Mrs. Decker, the likeness of a Rosie Landgraf, a nurse and an abortionist, who practiced her trade in West New York in 1896, and who was twice indicted in Hudson county in 1906 and 1909 for that offense. Through this photograph and Mrs. Decker's testimony, the Childers contrived to link Rosie of evil fame with Georger; and there was kindredship in criminal disposition; her vicious vocation readily lent itself to his heartless deed, and their geographical nearness made for probability that they were partners in doing away with the baby; and besides, Mrs. Decker had been told by her mother that *Page 608 
Rosie had been to Washington on a mysterious trip around February of 1896. But Sophie of 1885 had to be touched up a bit to make of her the Rosie of 1896, and that was done. Walter testified that Sophie and Rosie are the same in German, which is not true, and Mrs. Decker says Rosie changed her name to Sophie after her first indictment, about 1889, and that is not borne out by the later indictments against Rosie. Rosie or Sophie of the picture, it is asserted, appears in nurse's garb, and Mrs. Childers says that Sophie left off chamber-maiding in 1885 to become a nurse. If that be true, she dressed that way before she started. Now it turns out that the portrait of Mrs. Decker's Rosie, the abortionist of West New York, is not the photograph of Sophie of the Marion Hotel, Boston, and was not given to Mrs. Childers in 1885, as she testified, for it is established beyond peradventure that the paper on which it was printed did not come into use in the United States until the early nineties, and the hat and dress of Rosie of the picture did not come into fashion until more than seven years after the supposed Sophie and Mrs. Childers parted. The photograph is a "plant." A facsimile appeared in the New York Daily News October 10th, 1930. Where the Childers got the one by which they deceived their counsel and which they fraudulently sought to impose upon the court is not known, but it may be said with confidence that the scurvy plot was not alone the work of the cunning Childerses, duped into the belief that much fiction and some perjury might win the prize. The Childers claim is denied.
James Edward Nicholson is an upstanding man of the athletic type, refined and cultured. As Joseph Marsden he was taken by the Nicholsons from the Washington Foundling Home, March 7th, 1896. He was a few days old when received at the home on a very stormy night, brought there by a man of twenty-two "very boyish looking, looked more like an overgrown high school boy than anybody else." (Georger was thirty-one.) That is the description given by the nurse, called by the matron to take the child, who says that her curiosity was so aroused by the unusual sight of a *Page 609 
young man bringing a child, that she inquired and he told her that he was the father of the child; that it was the child of a secret marriage; that the mother's father was very wealthy and was bitterly opposed to the marriage and would disinherit her and turn her out if he found out about it; that that was the reason they had for keeping the child's birth a secret; that they were not residents of Washington and that the child had been broughtto Washington on that account, to get away from the place of which they were residents. The tale of the boy-father was thrilling, it touched the imagination and created an atmosphere in the home, and as Joseph Marsden, the poor little rich boy, grew and genteel features developed, he became an outstanding figure among the orphaned, the illegitimate and the outcasts. The heartlessness, the inhumanity of his abandonment and his tragic fate struck a deep sympathetic chord, and the pathetic story, which had become gospel in the home and lost none of its fascination in the retelling, was related by the matron to the Nicholsons to persuade them to take him. The rehearsal by the matron may be inadmissible hearsay, but at best it was only the boy-father's tale; and the boy-father was not Georger. The Nicholsons were in moderate circumstances; good, clean-living people, and the boy was reared as their own, carefully and well. He had had intimations that he was not their offspring; he suspected it when his foster mother failed to send him his birth certificate, necessary for a promotion in the aviation service during the war, and he first learned the truth from her lips when he tried to establish himself at the lost one after reading the trustee's notice in a local newspaper for the lost heir. Intimate friends of Georger and Florence, and there were not a few, testified to his resemblance to one or the other or both of them, in some feature, action or mannerism, or in a plurality of them, each as his fancy or belief suggested, and most of them, if not all, formed opinions after his claim to kinship had been made known to them and prepared them for the identification; just as the other group had testified to Sova's striking resemblance to Florence after they knew of his claim. *Page 610 
Both groups found points of marked resemblance and were impressed with the genuineness of the claimant, and we do not question their sincerity, but we are of the belief that the claim to kinship subconsciously influenced them, and that in the absence of this persuasive factor not one of them would have observed a likeness generally or in the detail to which they have called attention. The race may be cast in one image but mother nature rarely duplicates. We have had before us the claimant Nicholson and his progressive portraits and have compared him and them with the photographs of the supposed parents and we do not see a resemblance; none upon which to conjecture a consanguineous relationship.
In Florence's letter to Mr. Case she said a family trait of the Georger family was that the lobe of the ear "turns up quite pronouncedly" — Georger's very close friends did not notice it and Nicholson's ears are not that way. They are normal; there is no observable inversion of the lobe.
Nicholson gave a demonstration in court of throwing his thumbs back, touching the wrist. The X-ray shows that he has a congenital dislocation of the thumb where it joins the hand, said to be atavistically hereditary and to lend probability of a natural tie to Georger. But it is not shown that Georger had a congenital dislocation. He could throw back his thumbs considerably, and so could his friend, Waters, who says he often vied with Georger in doing it. And so can many others, with stretched ligaments, do the trick.
A certain Sophie Landgraf, procured by Grace Wolf, might solve the mystery, assuming Georger's statement to Florence to be true, that she took the infant. Amelia Ries, known as Grace Wolf, unsavory, was a tenant of Georger's firm at 130 East Thirty-eighth street at the time. Nicholson's attorneys believe they have found Sophie Landgraf in Louise Ries, a sister of Amelia, now living in Milwaukee. They produced a Mrs. Erhardt, who tells us that a day or so before Valentine's day in 1896, her mother-in-law, a midwife, then living with her in Washington, came home with Sophie Landgraf and a baby, a week or less old, and asked her to take in and nurse the baby, saying she would be well paid. *Page 611 
Angered at her refusal, her mother-in-law left to look for quarters and returned in two or three hours and took Sophie and the baby away, saying she had found rooms at Sixth and K streets, N.W. And four years later, shortly before she died, her mother-in-law told her that the child was obtained at the Providence Hospital and was put in the Washington Foundling Home, and that it was born February 11th. Previously she had told her Sophie Landgraf came from New York. She saw Sophie Landgraf occasionally for a couple of weeks around the town with the witness' sister-in-law, Kate Rainey, unsavory, at Dismer's Cafe, a German resort, and then no more until recently, thirty-four years later, when she picked her out from among a lot of women employes leaving a store where she and they worked in Milwaukee. Mrs. Erhardt had made herself known to the Nicholson's lawyers after reading in a Washington paper an inquiry for information of the lost child. She told them her story. Louise Ries had been located in Milwaukee and she was sent there to make the identification. And Louise admits having lived with her sister, Grace Wolf, in New York; that she worked at Stern Brothers and returned to Milwaukee in April, 1896, to her former employer, Reckmeyer, with whom she has been ever since. She expressed willingness to tell all she knew, but was steadfast in her denial that she was Sophie Landgraf, that she knew anything of her or the lost child and she denied that she was ever in Washington but twice, in the summer of 1930 and once before in 1915, and save for Mrs. Erhardt's identification of her as Sophie Landgraf, who brought a baby to her house, there is nothing to deny her. Counsel feel that she could tell more, and that may be so, but her refusal to reveal more of her earlier life and her desire to "let the past remain buried" may reasonably be attributed to a natural distaste to uncover her sister's life of shame or to expose her sister's illegitimate child now living with her.
Mrs. Erhardt's testimony, taken as true, including much that is inadmissible hearsay, establishes that about the time the Georger child was born, Grace Wolf's sister, Louise, got *Page 612 
a boy baby, born February 11th, 1896, from the Providence Hospital and took him to the Washington Foundling Home, but that he was the "emergency" baby of the Providence Hospital or the Marsden baby abandoned at the foundling home is purely surmise. The baby of the Providence Hospital was a normal healthy child. The Marsden baby was puny, delicate. Mrs. Erhardt says Sophie's baby had a navel cord cut close to the body, a quarter inch long and sore; the Marsden baby's was too long (two inches), badly tied and blood clotted.
Mrs. Erhardt, in her sixties, mother of twelve children, well intentioned and sincere, as we believe, impressed us as honestly biased. Having cornered Sophie Landgraf, at least to her own satisfaction, she was seized with the humor that her side win, and this not uncommon phenomenon in witnesses is evident in her piecemeal and progressively helpful story. Although in close contact with Nicholson's lawyers for months, and their star witness, it was not until the night before she testified that she informed them that her mother-in-law had confided to her that Sophie got the baby from the Providence Hospital and left it at the foundling home; and it was not until on cross-examination that she let out that her mother-in-law gave the birthday of the child as February 11th. Her shallow excuse for not telling all this before was to shield her mother-in-law, now dead thirty years; and her reason for revealing it at the last minute was, to use her own language: "I thought this, that the woman had passed away, and if it would help the boy I couldn't see that I should [not] tell all what I know;" and in this spirit she added a finishing touch on the stand by giving the birthday. She is a kindly old lady and motherly disposed and sympathetically reached back into memory or somewhere to be accommodating. She had trained herself to tell the plausible, but once she forgot her cue, that the fuss with her mother-in-law over her refusal to take in the baby, which spoiled their annual celebration of St. Valentine's day in 1896, enabled her to fix the time and year that Sophie brought the baby. She was let off the stand to gather her thoughts. We ascribe nothing *Page 613 
sinister to her, but we think that, having found Sophie Landgraf in Louise Ries, she was swept on by an enthusiasm to solve the mystery and we feel that her casual statement on cross-examination that her mother-in-law told her the Sophie Landgraf baby was born February 11th, was an emotional untruth. As proof that it is fiction we need only refer to her testimony, that she was of the opinion that the baby was less than a week old when Sophie carried it and a satchel into her home two or three days before February 14th, and that that time (at most only two days old) she suspected it might be Sophie's own baby; Sophie was not an Indian. How much more of what the mother-in-law is said to have told this accommodating old lady is figment, and all is inadmissible hearsay, we need not speculate upon. But if what she related about Sophie Landgraf bringing an infant to her home February 12th or 13th, 1896, be not invention, it is established to a demonstrable certainty that that child was not Joseph Marsden. We have no question that Joseph Marsden, foundling, and James Edward Nicholson are one. The records of the Washington Foundling Home so testify and his foster mother vouches for him. But these same records bear witness that James Edward Nicholson is not the Georger child born February 11th, 1896. Joseph Marsden was received at the home January 23d 1896. His institutional biography reads: He was admitted upon the application of Joseph W. Marsden, January 23d 1896; date of birth, January 21st, 1896; nationality, American; file No. 452; admission passed on by committee February 4th, 1896; adopted March 5th, 1896. He was baptised by Father Foley, February 17th, 1896, and the baptismal records of St. Paul's Catholic Church and of the home certify the natal day as January 21st, 1896. The deed by which the home indentured Joseph Marsden to the Nicholsons describes him as born January 21st, 1896, and the matron who negotiated with Mrs. Nicholson for his adoption told her that he was six weeks old. And it is testimony that an attendant, Miss Weller, who left the home January 31st, 1896, told a witness, Mrs. Robertson, the gossip about Joseph before leaving. *Page 614 
All the pathetic incidents of Joseph Marsden's advent at the foundling home are perfectly consistent with his arrival there on January 23d 1896. The home was a public asylum, under federal management, for waifs of Washington, and as they were received they were registered. The record of Joseph Marsden is in its chronological and numerical order, and the suggestion of counsel that the then matron may have been persuaded for a consideration to make a false registration, to more effectively conceal the identity of the Georger child, finds not the slightest support in the proofs, nor in reason. Their paradoxical theory, that the boy-father, a hireling of Georger, resorted to false names and falsely represented himself to be the father, to hide the identity, and in the same breath gave a truthful history of the child that made for identification, is self-obliterating. And their impeachment of the records, because, as they contend, it was the policy of the home to conceal the identity of its inmates, carries no appeal. Of course, the institution kept confidential the history of its unfortunates, and although, no doubt, those who brought their mistakes took to subterfuge to cover their guilt, and the records bear their false testimony, there is nothing to warrant even an insinuation that the records do not truthfully describe institutional proceedings. By them Nicholson establishes that he was Joseph Marsden and by them it is proved that Marsden was in the home before the Georger child of February 11th, 1896, came into being. Nicholson's claim fails.
We have not treated seriously the weird tale of Mrs. Ward, who testified that one night in a Washington trolley car a woman nudged her fiance, Buckley, attracting his attention to another woman, and that he told her later that the other woman was Sophie Landgraf; that she noticed Sophie "just slightly; got a side view of her as she passed," and after thirty-four years she was able to identify the photograph of Louise Ries as the woman; that Sophie told Fritz, the bartender at Dismer's Cafe, and Fritz told Buckley and Buckley told her about a baby named Gray that was born at the Providence Hospital, and that Sophie put the baby in *Page 615 
a foundling home, and that the father was paying Sophie. There are such witnesses, and we have no doubt this one will be disappointed if she fails of notoriety. We may condone her offense, but we find no excuse for counsel intruding her deposition upon the court.
There is much of hearsay in the depositions and motion is made to strike it out, but that would be a troublesome and difficult and profitless task. In their zeal and fervor, all counsel have freely indulged in overstepping the limits of legal evidence, and the court, too, allowed a wide range, but we have taken care that the inadmissible hearsay testimony should not influence us.
The testimony of similarity of features and characteristics of claimants and the parents of the lost child is competent (Wigm.
§ 166; Douglass Peerage Case, 2 Harg. Coll. Jur. 386; Hubb.Evid. Suc. 444), and to that we have given consideration, but the opinion of witnesses of a general resemblance, their "there is something indefinable about him that reminds me," and their views that one is the offspring of the other, we regard as inadmissible. In re Turnbull, 4 N.Y. Supp. 607; In re Jessup,81 Cal. 408; Keniston v. Rowe, 16 Me. 38; Young v. Makepeace,103 Mass. 54; Jones v. Jones, 45 Md. 144.
What little of her accidental lodgment at the hospital related to Sister Mary Alice by the mother of the baby born at the Providence Hospital (not the gossip in the institution, nor the impressions of the attendants) is admissible hearsay, as is the pedigree given by the boy-father concerning the baby he brought to the foundling home; not testimonially, but as standards of comparison with the standard of identity established by the parents of the Georger child. Wigm. § 1494; Chamberlayne §2637. If, however, the boy-father was not the father, but a retainer of Georger, as Nicholson's counsel contend, then his is incompetent hearsay; and its repetition by the matron of the foundling home to Mrs. Nicholson Copeland is as manifestly inadmissible as is Mrs. Erhardt's testimony of what her mother-in-law told her where *Page 616 
Sophie Landgraf got and put the child, and its birthday. It is all second-hand and from unauthoritative sources.
The guardian ad litem of the missing child questions the constitutionality of "An act relating to testamentary trusts" (P.L. 1929 p. 436), under which these proceedings are brought. The statute provides that upon petition, notice and hearing and a finding of fact, that the disappearance of a beneficiary under a testamentary trust has been continuous for more than fourteen years next preceding the filing of the petition and that he has not been heard from or known within that period, and if the facts warrant a presumption of death, or if they do not, then, if it be found from the circumstances attending the disappearance that it is improbable that he will ever be located or his identity established, the chancellor may order the trust estate transferred to the person, as trustee, who would be entitled to it under the terms of the trust if the absentee had died intestate within the state on the day fourteen years after the date of disappearance, upon the new trustee giving bond to the chancellor to refund the estate to the absentee if living or to those lawfully representing him. Recovery by the absentee from the testamentary trustee is barred, and action on the refunding bond is limited to six years. The point raised is, that as the lost child's estate came into existence at his grandfather's death in 1912, the legislature had not the power in 1929 to limit the right of recovery on the refunding bond to six years. We find no merit in the objection. The constitutional limitation upon legislative interference with existing remedies for the enforcement of contracts is not involved, nor is the constitutional guarantee of property invaded, and as the statute provides for ample notice to the absentee, the due process of law requirement of the federal constitution is satisfied. The act creates no new rights; it provides a new remedy for existing rights. A right of action to recover the legacy from the testamentary trustee was in Cornelius as surviving legatee the moment the estate came into enjoyment, and he also had the right to administer the absentee's estate and as administrator a right of action to recover the legacy to his use as next of kin; the absentee's *Page 617 
disappearance for seven years raised a presumption of his death.Comp. Stat. p. 1904. The present action is in rem, a bill to quiet the title in nature, of his claim to the fund as against the absentee beneficiary of property abandoned or unclaimed by him, and the legislature could have declared the decree a finality; the six years reserved to the absentee in which to recover on the refunding bond is a privilege, not a limitation. Massachusetts has an act substantially like ours, and Chief-Justice Rugg, in Adams v. Adams, 211 Mass. 198, upheld its constitutionality upon the theory that "property abandoned by its owner may be taken into custody of law and distribution of it declared among those who would be the heirs of the absentee if he were deceased, all under reasonable limitation as to length of absence, precedent notice and safeguards for the security of the property," and that "fourteen years of absence and inattention to property is a sufficient time to warrant a finding of abandonment," and that "statutes like the one here in question are statutes of limitation and do not offend against constitutional guarantees." He points out that the limitation against the absentee is twenty years — fourteen years' abandonment and six years' liability on the refunding bond, and that barring the absentee of a right to recover after six years is far longer than is commonly provided. He holds that "the appointment of those who would be the heirs-at-law of the absentee, as trustee, and the division of the property among them, as in distributive shares, is not deprivation of property without due process of law, nor a failure to protect property in accordance with standards of law." And addressing himself to the objection, that the act is made expressly applicable to existing trustees, he reasons that "the principle is, that property withdrawn from the ordinary channels of use by an owner who cannot be found, should be distributed as an intestate's estate," and that "this principle having been determined by the legislature to be salutary, there is no countervailing reason why it should not apply to property already abandoned or in process of abandonment as well as that which may be abandoned in the future," and he holds that "this retroactive feature involves no unconstitutional *Page 618 
exercise of legislative power;" that "retroactive laws are not forbidden by either state or federal constitutions," and "while statutes ordinarily are given only a prospective operation, yet where by express terms they are made to apply to existing conditions, that of itself does not render them void if not open to objection in other respects."
Counsel submits that the decision was largely influenced by the requirement of the statute, that the court find facts sufficient to raise a presumption of death. Our statute makes the same provision, and we find from the facts, bearing in mind the presumption raised by our Death act, in pari materia, a presumption of death. But we can appreciate no material distinction in the alternative finding of the improbability that the absentee will ever be found or his identity established to warrant a discrimination or to persuade us not to adopt and follow the decision in approving the constitutionality of our act.
Counsel comments that as the absentee disappeared in February, 1896, and the distribution must be as of February, 1910, among those who would be entitled to it had he died in 1910, of a trust estate that did not come into existence until two years later, we have an anomaly in legislation that divests an estate before it vests, in favor of arbitrarily selected successors, that makes for unconstitutionality. The point is not clear. The operation of a statute otherwise lawful does not effect its validity, though its applicability may be questionable. The trust estate is within the purview of the statute, and, though it fixes a notional date for calculating the distribution, the devolution of title is in entire harmony with existing laws of succession.
The fund will be ordered paid to Vivian E. Cornelius in trust for the infant Georger, pitilessly forsaken, presumed dead, possibly drifting, or perchance he fell into arms that cherished him. Who knows? *Page 619